**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**SOUTHEASTERN DIVISION**

| | | |
|---|---|---|
| **KENNETH M. SPENCER,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 1:05 CV 29 LMB** |
| | ) | |
| **JO ANNE B. BARNHART,** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**MEMORANDUM**

This is a proceeding under 42 U.S.C. § 405(g) for judicial review of defendant's final

decision denying plaintiff Kenneth Spencer's application for a Period of Disability and Disability

Insurance Benefits under Title II of the Social Security Act.  This case has been assigned to the

undersigned United States Magistrate Judge pursuant to the Civil Justice Reform Act and is being

heard by consent of the parties. See 28 U.S.C. § 636(c).  Plaintiff has filed a Brief in Support of

the Complaint (Document Number 10), and defendant has filed a Brief in Support of the Answer

(Doc. No. 11).

**Procedural History**

On September 22, 2003, plaintiff filed his application for a Period of Disability and

Disability Insurance Benefits, claiming that he became unable to work due to his disabling

condition on September 11, 2003. (Tr. 71-73).  This claim was denied initially, and following an

administrative hearing, plaintiff's claim was denied in a written opinion by an Administrative Law

Judge (ALJ), dated September 18, 2004. (Tr. 49-50, 12-16). Plaintiff then filed a request for review of the ALJ's decision with the Appeals Council of the Social Security Administration (SSA), which was denied on December 16, 2004. (Tr. 7, 4-6). Thus, the decision of the ALJ stands as the final decision of the Commissioner. See 20 C.F.R. §§ 404.981, 416.1481 (2003).

## Evidence Before the ALJ

### A. ALJ Hearing

Plaintiff's administrative hearing was held on July 22, 2004. (Tr. 17). Plaintiff was present and was represented by counsel. (Tr. 19). The ALJ began by admitting a treatment note from Dr. M.B. Moore into evidence. (Id.). Plaintiff's attorney stated that plaintiff has been attempting to obtain complete records from Dr. Moore. (Id.). Plaintiff then stated that he only saw Dr. Moore one time and that Dr. Moore told him that there was nothing he could do for him. (Id.). Plaintiff testified that Dr. Moore recommended that plaintiff apply for disability benefits. (Tr. 20). The ALJ stated that he would keep the record open for a month in order for plaintiff to obtain Dr. Moore's records. (Tr. 20-21).

Plaintiff's attorney then made an opening statement. (Tr. 21). Plaintiff's attorney stated that plaintiff is experiencing musculo-skeletal problems affecting his low back, knees, and elbows. (Id.). Plaintiff's attorney stated that plaintiff, who weighs 320 pounds, is significantly overweight. (Id.). Plaintiff's attorney requested that the ALJ consider new rulings regarding obesity. (Tr. 21-22). Plaintiff's attorney stated that the ALJ should consider the fact that obesity may cause an otherwise non-disabling impairment to be disabling because it is an aggravating factor. (Tr. 22).

Plaintiff's attorney then examined plaintiff, who testified that he is 47 years of age and he is a high school graduate. (Id.). Plaintiff stated that he has not received any additional training or

schooling, other than firefighting training.  (Id.).  Plaintiff testified that he received certification in firefighting, although he is not a certified Emergency Medical Technician (EMT).  (Tr. 22-23). Plaintiff testified that he has also worked as an owner and operator of a furniture store in the preceding fifteen years.  (Tr. 23).  Plaintiff stated that he stopped working on or about September 17, 2003.  (Id.).

Plaintiff testified that he could no longer work because his back and knees bothered him too much.  (Id.).  Plaintiff stated that his knee and back problems began a couple years prior to the hearing and that his employer assigned him supervision work due to these problems.  (Tr. 23-24).  Plaintiff testified that the last time he worked, his job involved riding in the fire truck to the scene of the fire and surveying the scene, and then completing the rest of his work from the truck. (Tr. 24).  Plaintiff stated that he oversaw the fire ground, firefighting operations, and personnel. (Id.).  Plaintiff testified that his job, as he last performed it, did not involve physically active work. (Id.).  Plaintiff explained that the only physical activity that was required was getting in and out of the truck and walking around the scene of the fire.  (Id.).  Plaintiff stated that after he completed these tasks, he would usually sit or lean on the tailboard of the truck.  (Id.).  Plaintiff testified that he performed these limited duties for at least the last two years that he was employed.  (Tr. 25).

Plaintiff testified that he has been experiencing problems with his back, and that he can only sit for about twenty minutes.  (Id.).  Plaintiff stated that he begins to squirm after sitting for about ten minutes.  (Id.).  Plaintiff testified that he can only stand for about five minutes and he can hardly walk any distance.  (Id.).  Plaintiff stated that he experiences pain in his lower back, which he described as a headache that never goes away.  (Id.).  Plaintiff testified that the medicine he is taking for his back pain does not provide any relief.  (Id.).  Plaintiff stated that he

experiences pain and discomfort in his back almost constantly. (Tr. 26). Plaintiff testified that sometimes his pain radiates down his right leg almost to his ankle. (Id.). Plaintiff stated that this occurs when he stands too long or too frequently, sits too long, or lifts objects the wrong way. (Id.). Plaintiff described the pain that he experiences throughout the day as a dull pain. (Id.). Plaintiff stated that his back pain disrupts his sleep. (Tr. 27). Plaintiff testified that he experiences pain in both sides of his lower back but not in the center of his back. (Id.). Plaintiff stated that he has experienced pain at the level of severity described at the hearing for one to two years. (Id.).

Plaintiff testified that he takes over-the-counter medications, including Tylenol and Rolaids, which provide only minimal relief. (Id.). Plaintiff stated that his back pain is somewhat relieved when he stands up and moves around. (Tr. 28). Plaintiff testified that after he sits for twenty to thirty minutes, he has to stand up and move around for five to seven minutes. (Id.). Plaintiff stated that he sits on a bar stool when he does household activities. (Id.). Plaintiff testified that he can sit on the bar stool the same length of time as he can sit in a chair. (Id.). Plaintiff stated that he spends all day sitting and then periodically standing up and moving around to relieve his pain. (Tr. 28-29).

Plaintiff testified that Dr. Dausmann told him that he needed to try to start walking. (Tr. 29). Plaintiff stated that he has been walking to the mailbox almost every day, which is 135 to 140 steps. (Id.). Plaintiff testified that his back begins to bother him when he is about two-thirds of the way to the mailbox and that he has to rest for a while after he returns. (Id.). Plaintiff stated that his knees become stiff and painful, although his back bothers him more than his knees. (Id.). Plaintiff testified that every doctor that he has seen has told him that there is nothing they can do for his back. (Tr. 30). Plaintiff stated that he just recently was prescribed medication,

which has provided only minimal relief. (Id.). Plaintiff testified that he experiences difficulty sleeping due to pain. (Id.). Plaintiff stated that his knees are really stiff when he wakes up in the morning. (Id.). Plaintiff testified that he does not experience any side effects from the medications that he takes. (Id.).

Plaintiff stated that he also experiences irritability and difficulty concentrating due to the pain. (Tr. 30-31). Plaintiff testified that he has to read a piece of paper three to four times to comprehend the material. (Tr. 31). Plaintiff stated that he also experiences difficulty listening and paying attention during conversations due to the pain. (Id.). Plaintiff testified that he is very irritable and does not enjoy being around people. (Id.). Plaintiff stated that he does not leave the house to socialize. (Id.). Plaintiff testified that he seldom drives. (Id.). Plaintiff stated that he has not been to a Wal-Mart store in six years because he cannot walk down the aisles. (Id.). Plaintiff testified that the only place to which he drives, besides his attorney's office, the doctor's office, and the hearing, is the fire station where he used to work. (Tr. 32). Plaintiff stated that he drives about three miles to the fire station about once a week and he spends an hour or so there socializing with his former co-workers. (Id.). Plaintiff testified that he drove about 90 miles to the hearing and that he had to stop about four times on the way there due to his back pain and knee stiffness. (Id.).

Plaintiff testified that he is about six-feet-two-inches tall, and weighs 323 pounds. (Tr. 32-33). Plaintiff stated that he lives with his wife, who is employed as a housekeeper with Doctors Regional Medical Center. (Tr. 33). Plaintiff testified that when his wife is working, he is home alone. (Id.). Plaintiff stated that he washes the dishes while sitting on a bar stool. (Id.). Plaintiff testified that he prepares one meal a day, which usually consists of noodles or rice with

tuna.  (Id.).  Plaintiff stated that he does some dusting, although he cannot vacuum because the required pushing and pulling hurts his back.  (Tr. 33-34).  Plaintiff testified that he feeds and waters his wife's pets.  (Tr. 34).  Plaintiff stated that he listens to the radio, walks outside, and uses the computer when he is not doing chores.  (Id.).  Plaintiff testified that he checks his email and surfs the web on his computer.  (Id.).  Plaintiff stated that he also walks to his barn to water the outside animals.  (Id.).  Plaintiff testified that he does not help out with the grocery shopping and that he has not been inside a grocery store in years.  (Tr. 35).

Plaintiff testified that at his last job, he could not stand up at will.  (Id.).  Plaintiff explained that he had to sit for long periods of time to write reports and that he experienced difficulty concentrating after five to ten minutes of sitting down.  (Id.).  Plaintiff stated that he worked twenty-four hour shifts at his last job and he was off for two days after working each shift, which allowed him to go home and rest before he had to work again.  (Id.).  Plaintiff testified that eventually, he did not feel better after resting during his two days off.  (Id.).  Plaintiff stated that he would stay up for the whole twenty-four hour shift because it took him too long to get up after lying down due to the knee stiffness and back pain.  (Tr. 35-36).

The ALJ then examined plaintiff, who testified that he worked as a firefighter for seventeen years.  (Tr. 36).  Plaintiff explained that he began as a volunteer firefighter, and was later hired as a shift manager.  (Id.).  Plaintiff stated that he worked for the Butler County Fire Department.  (Id.).  Plaintiff testified that he worked in the position of shift commander, which was above the captain and equivalent to an assistant chief.  (Tr 37).  Plaintiff explained that he was in charge when the chief was not present.  (Id.).  Plaintiff testified that 200 volunteer firefighters worked for his department.  (Id.).  Plaintiff stated that he performed administrative

duties such as bookkeeping, keeping training records for the firefighters, and completing reports. (Id.).

Plaintiff testified that he uses the computer at home for ten to twenty minutes before he has to stand up and walk around. (Id.).

Plaintiff stated that Dr. Gary Dausmann is his regular physician. (Id.). Plaintiff testified that Dr. Dausmann referred him to M.B. Moore, an orthopedic surgeon. (Tr. 37-38). Plaintiff stated that he saw Dr. Moore one time. (Tr. 38).

Plaintiff testified that he does not go out often and that he does not go to the movies. (Id.). Plaintiff stated that his knees become stiff after he sits for long periods, and his back hurts constantly. (Id.). The ALJ noted that plaintiff had been sitting at the hearing for about half an hour and asked plaintiff if that was his limit. (Tr. 39). Plaintiff responded that it was past his limit. (Id.). The ALJ informed plaintiff that he could stand, and plaintiff indicated that he would. (Id.).

The ALJ next examined the vocational expert, Gary Weimholt, who testified that he heard the oral testimony and reviewed the vocational portion of the file. (Id.). Mr. Weimholt stated that he believed he could classify plaintiff's past work, although he had questions regarding plaintiff's work at the furniture store. (Id.).

The ALJ then questioned plaintiff regarding his work at the furniture store. (Tr. 40). Plaintiff testified that he owned the furniture store. (Id.). Plaintiff stated that it was a small family store that he took over when his father passed away. (Id.). Plaintiff testified that he moved furniture from the time he was thirteen years old. (Id.). Plaintiff explained that he delivered furniture for his father's store and also unloaded trucks for Muscle Van Lines when he was

eighteen years old until he was in his mid-twenties. (Id.). Plaintiff stated that he began working full-time for the fire department in March of 1992. (Tr. 40-41). Plaintiff testified that immediately prior to working at the fire department, he was trying to close his furniture store and he also worked at Gates Rubber Company for a week or two. (Tr. 41). Plaintiff stated that he and his wife ran the furniture store, which was a retail store, and he employed two men to deliver the furniture. (Id.). Plaintiff testified that he kept records of the daily sales, purchased the furniture, and delivered the furniture. (Id.).

The ALJ then examined the vocational expert, who classified plaintiff's work in the furniture store as retail sales as a manager, performed at a medium level. (Tr. 42). The vocational expert testified that the furniture moving aspect of the job would be classified as very heavy and unskilled. (Id.). He stated that plaintiff's work as a firefighter was skilled and very heavy, exerting in excess of 100 pounds of force. (Id.). The vocational expert testified that plaintiff then became something more akin to a deputy for the chief, which would be considered light and skilled. (Tr. 42-43). The vocational expert stated that plaintiff indicated that he was above a fire captain, which is considered medium. (Tr. 43). Plaintiff testified that he had a captain working for him. (Id.). The vocational expert expressed the opinion that plaintiff was a deputy chief. (Id.). Plaintiff testified that he acted as the chief when the chief was not present. (Id.). Plaintiff stated that there were fourteen substations, thirty-eight trucks, and 200 volunteer firefighters in his department. (Id.). Plaintiff testified that he worked out of the main station, although he responded to calls at other stations as well. (Tr. 43-44). The ALJ concluded that plaintiff's position was that of a deputy chief. (Tr. 44).

The ALJ then asked the vocational expert whether an individual plaintiff's age, with

plaintiff's vocational and education background, who could perform a sedentary level of exertion, and requires a thirty minute sit-stand option, could perform any of plaintiff's past work. (Id.). The vocational expert responded that such an individual could not perform plaintiff's past work. (Id.). The ALJ then asked the vocational expert whether there would be other work such an individual could perform that exists in significant numbers in the regional or national economy. (Id.). The vocational expert testified that there would be jobs that such an individual could perform, such as entry-level cashiering jobs. (Id.). The vocational expert testified that there are approximately 1,500 cashiering jobs regionally and 75,000 nationally, which would allow for alternating sitting and standing. (Tr. 44-45). The vocational expert stated that such an individual could also work at some information clerk jobs which are semi-skilled and allow for alternate sitting and standing. (Tr. 45). He testified that there are 1,000 of those jobs regionally and 50,000 nationally. (Id.). The vocational expert stated that such an individual could also perform some simple small parts assembly jobs and benchwork jobs, which involve sitting on a stool or standing at a workbench to assemble parts. (Id.). The vocational expert testified that these jobs are sedentary and that there are approximately 1,500 of such jobs regionally, and 75,000 nationally. (Tr. 45-46). Finally, the vocational expert testified that such an individual could also work as a general office clerk, which are semi-skilled and allow for alternate sitting and standing. (Tr. 46). He testified that there are approximately 1,500 of such jobs regionally, and 75,000 nationally. (Id.). The vocational expert stated that all of these jobs allow an individual to choose whether to sit or stand and the individual can perform equally well either sitting or standing. (Id.).

The ALJ next asked the vocational expert to assume the hypothetical individual also had a mild impairment to attention, concentration, or pace as the result of the distracting effects of pain

and/or medication. (Id.). The vocational expert testified that the individual would not be precluded from performing any of the jobs that he mentioned. (Id.). The ALJ then asked the vocational expert to assume the individual had a moderate impairment in attention, concentration, or pace. (Id.). The vocational expert testified that such an individual would perform less than average at the job that he mentioned. (Id.). He stated that such an individual would not be competitive. (Tr. 46-47).

Plaintiff's attorney then asked the vocational expert whether an individual who also needed to move around after twenty to thirty minutes for five to seven minutes would be able to perform the jobs mentioned. (Tr. 47). The vocational expert testified that if the moving is done within one's work station, it would not preclude the jobs discussed. (Id.). He noted that the clerical job would allow for more standing and moving around the office space. (Id.).

The ALJ concluded the hearing and stated that he would keep the record open in order for plaintiff to obtain records from Dr. Moore. (Tr. 47-48).

**B.    Relevant Medical Records**

The record reveals that plaintiff presented to Gary Dausmann, M.D. on September 15, 2003, complaining of back and knee pain. (Tr. 114). Upon physical examination, Dr. Dausmann found tenderness in the lower lumbar[1] area. (Id.). Dr. Dausmann found mild tenderness over the

---

[1]The back is comprised of the cervical, thoracic and lumbar regions. In common terms, the cervical region of the spinal column is the neck; the thoracic region is the main part of the back; and the lumbar region is the lower back. There are seven cervical vertebrae, twelve thoracic vertebrae, and five lumbar vertebrae. The sacrum lies directly below the fifth lumbar vertebra. The coccyx, or tail bone, lies below the sacrum. See J. Stanley McQuade, Medical Information Systems for Lawyers, § 6:27 (1993).

medial and lateral joint lines of the right knee, and no obvious effusions[2] in plaintiff's knees. (Id.). Dr. Dausmann stated that plaintiff had normal range of motion in his knees. (Id.). Dr. Dausmann's impression was arthritis[3] of the knees, back pain, and morbid obesity. (Id.). He started plaintiff on Celebrex[4] and ordered x-rays of plaintiff's spine and knees. (Id.).

Plaintiff underwent x-rays of the lumbar spine and right knee on September 29, 2003. (Tr. 112). Willeford J. Stoecker, M.D., the reviewing physician, stated that the x-rays of the lumbar spine revealed extensive degenerative disk changes at essentially every intervertebral disk level in the lumbar spine, along with associated spurring on vertebral endplates at every level. (Id.). Dr. Stoecker noted that associated spurring was encroaching the spinal canal at numerous levels, best appreciated at L[5]3-4, L4-5, and L5-S[6]1. (Id.). He also found associated mild levoscoliois[7] at L3, early degenerative facet changes, and calcification in the wall of the abdominal aorta. (Id.). Dr. Stoecker's impression was levoscoliosis, extensive degenerative disk and facet changes at multiple levels, and possible canal encroachment or developing stenosis[8] due to spurring in the lower

---

[2]The escape of fluid from the blood vessels or lymphatics into the tissues or a cavity. Stedman's Medical Dictionary, 570 (27th Ed. 2000).

[3]Inflammation of a joint or a state characterized by inflammation of joints. Stedman's at 149.

[4]Celebrex is a nonsteroidal anti-inflammatory drug indicated for the relief of osteoarthritis, rheumatoid arthritis, and acute pain. See Physician's Desk Reference (PDR), 3096 (59th Ed. 2005).

[5]Abbreviation for lumbar vertebra (L1-5). Stedman's at 956.

[6]Abbreviation for sacral vertebra (S1-5). Stedman's at 1586.

[7]The abnormal curvature of the spine, where the main curve of the spine is curved to the left. See Stedman's at 1606.

[8]Narrowing of the spinal canal. See Stedman's at 1695.

lumbar region at L3-4, L4-5, and L5-S1.  (Id.).  With regard to plaintiff's knees, Dr. Stoecker found minimal early narrowing of the medial joint space, which he noted represents the early changes of degenerative osteoarthritis.[9]  (Id.).  Dr. Stoecker did not find joint effusions in either knee.  (Id.).  Dr. Stoecker's impression with respect to both knees was "minimal early narrowing of the medial joint space."  (Id.).

Plaintiff saw Dr. Dausmann for a follow-up visit on September 29, 2003.  (Tr. 138). Plaintiff indicated that the Celebrex had helped and that he was about thirty percent improved. (Id.).  Dr. Dausmann stated that the x-rays of plaintiff's back revealed degenerative changes, while the x-rays of the knees revealed no definite abnormalities.  (Id.).  His impression was arthritis of the back and knees, and hypertension.[10]  (Id.).  Dr. Dausmann recommended that plaintiff continue Celebrex and lose weight.  (Id.).

On October 16, 2003, Chul Kim, M.D. examined plaintiff at the request of the State agency.  (Tr. 116-17).  Plaintiff reported that he experiences lower back pain when he sits for 20 minutes, stands for 5 to 10 minutes, walks 300 to 400 feet, or lifts any weight.  (Tr. 116). However, plaintiff also reported that he was able to lift up to 100 pounds.  (Id.).  Plaintiff complained of pain in both knees.  (Id.).  Upon physical examination, Dr. Kim found that plaintiff's gait was stable, he was able to bear full weight on both legs, he was able to walk on his toes, and he was able to get on and off the examining table without significant problem. (Tr. 117).  Dr. Kim noted that when plaintiff first got up from his chair, he complained of pain in

---

[9]Arthritis characterized by erosion of articular cartilage, either primary or secondary to trauma or other conditions, which results in pain and loss of function primarily to weight-bearing joints.  See Stedman's at 1282.

[10]High blood pressure.  Stedman's at 855.

his knees, but after a few steps, he felt better. (Id.). Dr. Kim stated that plaintiff experienced pain in both knees when walking on his heels and squatting. (Id.). Dr. Kim found that flexion of the knees was limited to 105 degrees but did not cause plaintiff much pain, and flexion of the lumbar spine was up to 90 degrees, with lower back pain but no tenderness. (Id.). Straight leg raising was up to 75 degrees bilaterally with lower back pain, and with exertion, plaintiff was short of breath. (Id.). No edema[11] was found in plaintiff's legs. (Id.). Neurological examination was nonspecific including sensory, motor, reflex, and muscle mass. (Id.). Dr. Kim's impression was chronic lower back pain with lumbar strain, rule out degenerative lumbar disc disease, chronic pain in knees with probable osteoarthritis, and hypertension. (Id.).

Plaintiff saw Dr. Dausmann again on October 20, 2003, for treatment of his hypertension. (Tr. 136). Plaintiff reported that he was unable to stand more than ten to twenty minutes and experienced difficulty sitting for extended periods, due to his arthritis. (Id.).

Pam Gerlach, a State agency medical consultant, completed a Physical Residual Functional Capacity Assessment on October 21, 2003. (Tr. 120-28). Ms. Gerlach expressed the opinion that plaintiff could lift or carry twenty pounds occasionally; lift or carry 10 pounds frequently; stand or walk at least 2 hours in an 8-hour workday; sit for about 6 hours in an 8-hour workday; was unlimited in his ability to push or pull; could frequently balance, kneel, crouch, and crawl; could occasionally climb, balance, and stoop; and had no manipulative, visual, communicative, or environmental limitations. (Tr. 121-25).

On December 3, 2003, plaintiff saw Dr. Dausmann, at which time he reported that his

---

[11]An accumulation of an excessive amount of watery fluid in cells or intercellular tissues. Stedman's at 566.

back and knee pain was not improving with the Celebrex. (Tr. 135). Dr. Dausmann discontinued the Celebrex and started plaintiff on Mobic.[12] (Id.). On December 17, 2003, Dr. Dausmann continued the current medications. (Tr. 134). On January 19, 2004, plaintiff reported back and left knee pain which was moderate to severe. (Tr. 133). Upon physical examination, Dr. Dausmann found tenderness in the lower lumbar area, and mild decreased range of motion in his left knee. (Id.). Dr. Dausmann's impression was arthritis of the back and knee and hypertension. (Id.). He scheduled an MRI[13] of plaintiff's back and left knee. (Id.).

Plaintiff underwent MRI scans of his left knee and lumbosacral spine on January 21, 2004. (Tr. 129-31). The MRI of his lumbosacral spine revealed narrowing of the intervertebral spaces from L1 down to S1, disc degeneration on all levels, minimal disc bulging at L5-S1, and spinal canal stenosis at L4-5. (Tr. 129). The MRI was negative for an overt herniated disc. (Id.). The MRI of plaintiff's left knee revealed small intrasubstance degenerations in the anterior and posterior horns of the lateral and medial menisci,[14] a minimal amount of fluid behind the kneecap, a small baker's cyst,[15] and no evidence of a torn meniscus. (Tr. 130).

On February 5, 2004, plaintiff presented to Dr. Dausmann for a follow-up of his hypertension and review of his MRI. (Tr. 132). Dr. Dausmann's impression was degenerative

---

[12] Mobic is a nonsteroidal anti-inflammatory drug indicated for the relief of osteoarthritis. See PDR at 1006-07.

[13] Magnetic Resonance Imaging. Stedman's at 1135.

[14] Menisci are crescent-shaped intraarticular fibrocartilage found in certain joints. See Stedman's at 1091.

[15] A collection of fluid which has escaped from the knee joint or a bursa and formed a new fluid lined sac. See Stedman's at 446.

disease[16] of the back and knee and folliculitis.[17]  (Id.).  He recommended that plaintiff continue the

Mobic and referred plaintiff to an orthopedic physician for an evaluation of his knee.  (Id.).

Plaintiff saw M.B. Moore, M.D., on February 23, 2004.  (Tr. 142-43).  Plaintiff reported

that he could not sit for longer than 40-60 minutes without experiencing significant pain and

having to shift, stand, and walk.  (Tr. 142).  Plaintiff stated that his pain is primarily in the low

back, although he occasionally experiences pain in the left gluteal region.  (Id.).  Plaintiff also

reported swelling and pain in both knees, which increases when he ambulates.  (Id.).  Upon

physical examination, Dr. Moore found that plaintiff ambulates with a "very mild limp."  (Id.).

Dr. Moore found that, although plaintiff had some tenderness over the left sacroiliac joint, his hip

range of motion was normal.  (Id.).  Dr. Moore stated that plaintiff's lumbar flexibility was

diminished, particularly in lateral bending both left and right, although his flexion was normal.

(Id.).  Plaintiff experienced a significant increase in pain with hyperextension.  (Id.).  With regard

to plaintiff's knee, Dr. Moore found tenderness along the medial joint line, minimal swelling,

range of motion of full extension, and flexion of 120 degrees.  (Id.).  No gross laxity was found.

(Id.).  Dr. Moore stated that plaintiff's MRI of the lumbar spine revealed significant stenosis at

L4-5, but no frank herniation; facet joint arthritis at multiple levels, but no spondylolisthesis;[18] and

degeneration of discs in the entire lumbar spine.  (Id.).  With regard to plaintiff's knee, Dr. Moore

found some degeneration of both the medial and lateral meniscus, but no full-thickness tear; and

---

[16]A synonym for osteoarthritis.  See Stedman's at 513.

[17]An inflammatory reaction in hair follicles.  See Stedman's at 696.

[18]Forward movement of one of the lower lumbar vertebrae on the vertebra below it, or
upon the sacrum.  Stedman's at 1678.

some fluid.  (Id.).  Dr. Moore's impression was chronic back pain secondary to early arthritis and lumbar stenosis; and early degenerative arthritis of the knee.  (Tr. 143).  Dr. Moore recommended that plaintiff be placed on anti-inflammatories.  (Id.).  He stated that plaintiff is not a surgical candidate.  (Id.).  Dr. Moore stated that injections would be reasonable unless plaintiff were to develop any mechanical-type symptoms, at which time he would need a scope.  (Id.).  Dr. Moore expressed the opinion that plaintiff's ability to work would be quite limited, especially with respect to any job that requires him to stand or sit for any length of time.  (Id.).

Dr. Moore also completed a Residual Functional Capacity Assessment, based upon plaintiff's February 23, 2004 visit.  (Tr. 144-150).  Dr. Moore's diagnosis was spinal stenosis and intervertebral disc degeneration at all levels, as shown by the MRI of the lumbar spine.  (Tr. 144). Dr. Moore stated that plaintiff's positive straight leg raising was limited to 40 degrees on the left leg, he had abnormal gait, sensory loss, reflex changes, muscle spasm, muscle weakness, and L5-S1 radiculopathy.[19]  (Tr. 145).  Dr. Moore indicated that plaintiff was not taking any medications that would cause side effects.  (Tr. 147).  Dr. Moore stated that plaintiff could not sit for more than 60 minutes sustained, could stand for less than 2 hours sustained, could walk for 20 minutes sustained, could lift or carry a maximum of 10 pounds sustained, was limited in his ability to do repetitive bending, twisting, climbing, working around moving machinery, driving machinery, working at temperature extremes, exposure to vibrations, and balancing, and was not limited in his ability to grip or finger.  (Tr. 148).  Dr. Moore expressed the opinion that plaintiff was not capable of sustaining a 40-hour work week; plaintiff requires a job that permits shifting positions at will in unpredictable intervals from sitting, standing, or walking; and plaintiff would require

_____

[19]Disorder of the spinal nerve roots.  Stedman's at 1503.

unscheduled breaks every 1 to 2 hours during an 8-hour working day to obtain relief from his symptoms. (Tr. 149). Finally, Dr. Moore stated that plaintiff does not require a cane or other assistive device while engaging in occasional standing or walking. (Id.).

Plaintiff saw Dr. Dausmann on April 5, 2004. (Tr. 140). Dr. Dausmann stated that plaintiff was "doing well." (Id.). He stated that plaintiff still experienced back and knee pain, although the pain is not as bad as it was, as the Mobic provides relief. (Id.). Dr. Dausmann reported that plaintiff's blood pressure was "doing well" and that he had lost a significant amount of weight. (Id.). Upon physical examination, Dr. Dausmann found "mild tenderness" of the lower lumbar area and knees. (Id.). Dr. Dausmann's impression was hypertension, controlled; and back and knee pain. (Id.). He recommended that plaintiff continue his current medications and return in four months. (Id.).

### The ALJ's Determination

The ALJ made the following findings:

1.   Claimant met the disability insured status requirements of the Act in September 2003, the date he stated he became unable to work.

2.   Claimant has not performed SGA since September 2003.

3.   The medical evidence establishes that claimant has the severe impairments of arthritis of the knee and back pain due to early arthritis and lumbar stenosis.

4.   Claimant's severe impairments do not meet or equal any listed impairment of Appendix 1, Subpart P of Social Security Administration Regulation No. 4.

5.   Claimant has an RFC for employment at the sedentary exertional level with a sit or stand option and mild impairment to attention/concentration due to pain.

6.   Claimant's subjective complaints are not fully credible.

7.   Claimant does not retain the RFC to perform his past relevant work.

8.     Claimant is a younger individual with a high school education and past relevant work as a retail sales manager, a firefighter, and a deputy fire chief.

9.     Based upon claimant's RFC and vocational factors, there are jobs existing in significant numbers within the national economy that he can perform.

10.    Claimant was not under a "disability," as defined in the Social Security Act, at any time through the date of this decision (20 C.F.R. § 404.1520(f)).

(Tr. 15-16).

The ALJ's final decision reads as follows:

Based upon the Title II application filed on September 22, 2003, claimant is not entitled to a period of disability or disability insurance benefits as set forth in sections 216(I) and 223, of the Social Security Act, as amended.

(Tr. 20).


# Discussion

A.     **Standard of Review**

Judicial review of a decision to deny Social Security benefits is limited and deferential to the agency.  See Ostronski v. Chater, 94 F.3d 413, 416 (8th Cir. 1996).  The decision of the SSA will be affirmed if substantial evidence in the record as a whole supports it.  See Roberts v. Apfel, 222 F.3d 466, 468 (8th Cir. 2000).  Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a conclusion.  See Kelley v. Callahan, 133 F.3d 583, 587 (8th Cir. 1998).  If, after review, it is possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the denial of benefits must be upheld.  See Robinson v. Sullivan, 956 F.2d 836, 838 (8th Cir. 1992).  The reviewing court, however, must consider both evidence that supports and evidence that detracts from the Commissioner's decision.  See Johnson v. Chater, 87 F.3d 1015,

1017 (8th Cir. 1996)(citing Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993)). "[T]he court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contrary." Burress v. Apfel, 141 F.3d 875, 878 (8th Cir. 1998). The analysis required has been described as a "searching inquiry." Id.

## B.    The Determination of Disability

The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 416 (I) (1) (a); 42 U.S.C. § 423 (d) (1) (a). The claimant has the burden of proving that s/he has a disabling impairment. See Ingram v. Chater, 107 F.3d 598, 601 (8th Cir. 1997).

The SSA Commissioner has established a five-step process for determining whether a person is disabled. See 20 C.F.R. §§ 404.1520, 416.920; Bowen v. Yuckert, 482 U.S. 137, 141-42, 107 S. Ct. 2287, 2291, 96 L. Ed. 2d. 119 (1987); Fines v. Apfel, 149 F.3d 893, 894-895 (8th Cir. 1998). First, it is determined whether the claimant is currently engaged in "substantial gainful employment." If the claimant is, disability benefits must be denied. See 20 C.F.R. §§ 404.1520, 416.920 (b). Step two requires a determination of whether the claimant suffers from a medically severe impairment or combination of impairments. See 20 C.F.R §§ 404.1520 (c), 416.920 (c). To qualify as severe, the impairment must significantly limit the claimant's mental or physical ability to do "basic work activities." Id. Age, education and work experience of a claimant are not considered in making the "severity" determination. See id.

If the impairment is severe, the next issue is whether the impairment is equivalent to one of

the listed impairments that the Commissioner accepts as sufficiently severe to preclude substantial gainful employment. See 20 C.F.R. §§ 404.1520 (d), 416.920 (d). This listing is found in Appendix One to 20 C.F.R. 404. 20 C.F.R. pt. 404, subpt. P, App. 1. If the impairment meets or equals one of the listed impairments, the claimant is conclusively presumed to be impaired. See 20 C.F.R. §§ 404.1520 (d), 416.920 (d). If it does not, however, the evaluation proceeds to the next step which inquires into whether the impairment prevents the claimant from performing his or her past work. See 20 C.F.R. § 404.1520 (e), 416.920 (e). If the claimant is able to perform the previous work, in consideration of the claimant's residual functional capacity (RFC) and the physical and mental demands of the past work, the claimant is not disabled. See id. If the claimant cannot perform his or her previous work, the final step involves a determination of whether the claimant is able to perform other work in the national economy taking into consideration the claimant's residual functional capacity, age, education and work experience. See 20 C.F.R. §§ 404.1520 (f), 416.920 (f). The claimant is entitled to disability benefits only if s/he is not able to perform any other work. See id. Throughout this process, the burden remains upon the claimant until s/he adequately demonstrates an inability to perform previous work, at which time the burden shifts to the Commissioner to demonstrate the claimant's ability to perform other work. See Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998).

**C.      Plaintiff's Claims on Appeal**

Plaintiff raises two claims on appeal of the Commissioner's decision. Plaintiff first argues that the ALJ erroneously found plaintiff's subjective complaints of pain and limitation not credible. Plaintiff next argues that the ALJ erred in assessing plaintiff's residual functional capacity.

### 1.    Credibility Determination

Plaintiff argues that the ALJ erroneously found plaintiff's subjective complaints of pain and limitation not credible.  Plaintiff specifically argues that the ALJ erred by not properly considering the Polaski factors in making his determination and by not properly evaluating the medical evidence.

"While the claimant has the burden of proving that the disability results from a medically determinable physical or mental impairment, direct medical evidence of the cause and effect relationship between the impairment and the degree of claimant's subjective complaints need not be produced." Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984) (quoting settlement agreement between Department of Justice and class action plaintiffs who alleged that the Secretary of Health and Human Services unlawfully required objective medical evidence to fully corroborate subjective complaints).  Although an ALJ may reject a claimant's subjective allegations of pain and limitation, in doing so the ALJ "must make an express credibility determination detailing reasons for discrediting the testimony, must set forth the inconsistencies, and must discuss the Polaski factors." Kelley, 133 F.3d at 588.  Polaski requires the consideration of:  (1) the claimant's daily activities; (2) the duration, frequency, and intensity of the pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness and side effects of medication; and (5) functional restrictions.  Polaski, 739 F.2d at 1322.

Under Polaski, an ALJ must also consider a claimant's prior work record, observations by third parties and treating and examining doctors, and the claimant's appearance and demeanor at the hearing.  739 F.2d at 1322.  In evaluating the evidence of nonexertional impairments, the ALJ is not free to ignore the testimony of the claimant "even if it is uncorroborated by objective

medical evidence." Basinger v. Heckler, 725 F.2d 1166, 1169 (8th Cir. 1984).  The ALJ may, however, disbelieve a claimant's subjective complaints when they are inconsistent with the record as a whole.  See Clark v. Chater, 75 F.3d 414, 417 (8th Cir. 1996).

The court finds that the ALJ's credibility determination regarding plaintiff's subjective complaints of pain and limitations is supported by substantial evidence in the record as a whole. Plaintiff claims that the ALJ erred in finding that plaintiff's subjective complaints of disabling pain are not fully supported by the evidence, despite the objective medical evidence of plaintiff's impairments.  Plaintiff mischaracterizes the nature of a finding of pain in the medical evidence. "[T]he question is not whether [plaintiff] suffers any pain; it is whether [plaintiff] is fully credible when [he] claims that [the pain] hurts so much that it prevents h[im] from engaging in h[is] prior work."  Benksin v. Bowen, 830 F.2d 878, 883 (8th Cir. 1987).  Thus, the relevant inquiry is whether or not plaintiff's complaints of pain to a degree of severity to prevent him from working are credible.

In this case, the ALJ properly pointed out Polaski factors and other inconsistencies in the record as a whole which detract from plaintiff's complaints of disabling pain.  The ALJ first discussed plaintiff's work record.  Although not controlling on the issue of plaintiff's complaints of disabling pain, a claimant's work history is a proper factor in assessing credibility.  See Brown v. Chater, 87 F.3d 963, 965 (8th Cir. 1996).  The ALJ properly credited plaintiff for his good prior work record.

The ALJ next discussed the medical evidence.  The ALJ stated that the observations by plaintiff's treating physician and the state agency medical consultant show that plaintiff is capable of working.  Although the plaintiff contends that the ALJ did not consider all of the medical

evidence, the ALJ conducted a very thorough review of the objective medical evidence. Dr. Dausmann, plaintiff's treating physician, found only mild tenderness of plaintiff's knees, with no obvious effusions, and only mild decreased range of motion. (Tr. 114, 133, 140). On April 5, 2004, the most recent medical record contained in the file, Dr. Dausmann expressed the opinion that plaintiff was "doing well," and found only mild tenderness in plaintiff's back and knees. (Tr. 140). Notably, Dr. Dausmann did not impose any functional limitations on plaintiff. The presence or absence of functional limitations is an appropriate Polaski factor, and "[t]he lack of physical restrictions militates against a finding of total disability." Hutton v. Apfel, 175 F.3d 651, 655 (8th Cir. 1999)(citing Smith v. Shalala, 987 F.2d 1371, 1374 (8th Cir. 1993)). Based upon a review of plaintiff's medical records, the State agency medical consultant expressed the opinion that plaintiff could lift twenty pounds occasionally, lift ten pounds frequently, stand or walk at least 2 hours in an 8-hour workday, and sit 6 hours in an 8-hour workday. (Tr. 121).

The ALJ next noted that plaintiff took medications to relieve his symptoms. Dr. Dausmann prescribed anti-inflammatories, which plaintiff indicated provided relief. (Tr. 138, 140). Evidence of effective medication resulting in relief may diminish the credibility of a claimant's complaints. See Rose v. Apfel, 181 F.3d 943, 944 (8th Cir. 1999). Further, although plaintiff complained of disabling back pain, he does not take any prescription pain medication. Rather, plaintiff testified at the hearing that he takes over-the-counter medications such as Tylenol and Rolaids. The failure to request pain medication is also an appropriate consideration when assessing the credibility of a claimant's complaints of pain. See Depover v. Barnhart, 349 F.3d 563, 566 (8th Cir. 2003). In addition, plaintiff testified at the hearing that the medications that he takes do not produce any side effects. The absence of side effects from medication is a proper

factor to be considered in evaluating subjective complaints of pain.  See McKinney v. Apfel, 228 F.3d 860, 864 (8th Cir. 2000).

The ALJ next stated that an interviewer with the Social Security Administration field office noted that plaintiff was stiff while walking and moved around in his chair while sitting, but had no difficulty with understanding or concentrating.  The fact that plaintiff had no difficulty understanding or concentrating while completing his application for benefits is inconsistent with plaintiff's testimony that he experiences significant difficulty reading due to his inability to concentrate, and must read a single piece of paper several times in order to comprehend the material.  (Tr. 31).  The ALJ noted that he observed that plaintiff spoke in a normal tone and stood for 30 minutes at the hearing.  The ALJ's personal observations of the claimant during the hearing is a factor to be considered in assessing the credibility of the claimant's alleged limitations.  See Johnson v. Apfel, 240 F.3d 1145, 1147-48 (8th Cir. 2001).

The ALJ next discussed plaintiff's daily activities.  The ALJ stated that plaintiff's daily activities of taking care of dogs, chickens and ducks; paying bills; doing laundry; washing dishes; mowing the lawn; banking; preparing meals; exercising in the swimming pool; watching television; reading; using a computer; doing puzzles; and driving were consistent with an ability to perform a restricted range of sedentary work.  Significant daily activities may be inconsistent with claims of disabling pain.  See Haley v. Massanari, 258 F.3d 742, 748 (8th Cir. 2001).  The ALJ concluded: "[i]n view of the above, I find that the claimant's allegation of inability to work is not fully credible."  (Tr. 15).

An administrative opinion must establish that the ALJ considered the appropriate factors.  See Holley v. Massanari, 253 F.3d 1088, 1092 (8th Cir. 2001).  However, each and every Polaski

factor need not be discussed in depth, so long as the ALJ points to the relevant factors and gives good reasons for discrediting a claimant's complaints. See Dunahoo v. Apfel, 241 F.3d 1033, 1038 (8th Cir. 2001). In this case, the reasons given above by the ALJ for discrediting plaintiff's complaints of disabling pain are sufficient and his finding that plaintiff's complaints are not fully credible is supported by substantial evidence.

### 2. Residual Functional Capacity

Plaintiff next argues that the ALJ erred in assessing his residual functional capacity. Specifically, plaintiff contends that the ALJ relied on the non-medical opinion of the State agency consultant and ignored Dr. Moore's residual functional capacity assessment, which was the only medical assessment of plaintiff's residual functional capacity contained in the record.

Determination of residual functional capacity is a medical question and at least "some medical evidence 'must support the determination of the claimant's [residual functional capacity] and the ALJ should obtain medical evidence that addresses the claimant's ability to function in the workplace.'" Hutsell v. Massanari, 259 F.3d 707, 712 (8th Cir. 2001) (quoting Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001)). Further, determination of residual functional capacity is "based on all the evidence in the record, including 'the medical records, observations of treating physicians and others, and an individual's own description of his limitations.'" Krogmeier v. Barnhart, 294 F.3d 1019, 1024 (8th Cir. 2002) (quoting McKinney, 228 F.3d at 863).

After discussing the objective medical evidence and plaintiff's own testimony regarding his impairments, the ALJ concluded:

> The evidence persuades me that the claimant has a retained residual functional capacity for work activity at the sedentary exertional level with a sit or stand option and mild impairment to attention/concentration due to pain. This RFC is partially supported by the medical evidence and the evidence of record.

(Tr. 14).  Contrary to plaintiff's claim that the ALJ relied heavily on the State agency consultant's opinion, it appears that the ALJ considered the record as a whole, including the opinion of Dr. Moore.  It has been held to be error for an ALJ to give more weight to non-medical evidence than to medical evidence.  See Jeffcoat v. Bowen, 840 F.2d 592, 596 (8th Cir. 1988).  However, in making a finding of residual functional capacity, an ALJ may consider non-medical evidence, although the residual functional capacity finding must be supported by *some* medical evidence.  See Lauer, 245 F.3d at 704 (emphasis added).

In analyzing medical evidence, "[i]t is the ALJ's function to resolve conflicts among 'the various treating and examining physicians'" Johnson v. Apfel, 240 F.3d 1145, 1148 (8th Cir. 2001) (quoting Bentley v. Shalala, 52 F.3d 784, 787 (8th Cir. 1995)).  "Ordinarily, a treating physician's opinion should be given substantial weight."  Rhodes v. Apfel, 40 F. Supp.2d 1108, 1119 (E.D. Mo. 1999) (quoting Metz v. Shalala, 49 F.3d 374, 377 (8th Cir. 1995)).  This is to be contrasted with the axiom that "[t]he opinion of a consulting physician who examines claimant once or not at all does not generally constitute substantial evidence."  Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000) (quoting Kelley, 133 F.3d at 589).  Further, a treating physician's opinion will typically be given controlling weight when the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record."  Prosch v. Apfel, 201 F.3d 1010, 1012-1013 (8th Cir. 2000) (quoting 20 C.F.R. § 404.1527 (d)(2) (bracketed material in original).  However, such opinions do "not automatically control, since the record must be evaluated as a whole."  Id. at 1013 (quoting Bentley, 52 F.3d at 785-786).  Opinions of treating physicians may be discounted or disregarded where other "medical assessments 'are supported by better or more thorough

medical evidence.'" Id. (quoting Rogers v. Chater, 118 F.3d 600, 602 (8th Cir. 1997)).  An ALJ

is free to reject the conclusions of any medical source if those findings are inconsistent with the

record as a whole.  See Johnson, 240 F.3d at 1148.

The ALJ provided the following explanation for rejecting Dr. Moore's residual functional

capacity assessment:

> The post hearing medical report at Exhibit 8F with an RFC assessment is based on one
> visit and is not inconsistent with my RFC assessment.  But I do not concur that the
> claimant cannot sustain a 40-hour work week and needs to take breaks of one to two
> hours which is not supported by the medical evidence and the evidence of record.  In his
> testimony, the claimant says he cannot sit for more than 10 minutes, but he sat for one-half
> hour at the hearing, which also is inconsistent with his statement to the doctor in Exhibit
> 8F/1.  The doctor wants him to walk and he is trying.  He does no light housework but
> waters the animals and uses a computer.  Moreover, according to the state agency medical
> consultant, the claimant could do essentially sedentary work (Exhibit 3F).

(Id.).  From this discussion, it is clear that the ALJ considered the residual functional capacity

assessment of Dr. Moore, but found that Dr. Moore's opinion that plaintiff cannot sustain a 40-

hour work week was inconsistent with the record as a whole.  The ALJ properly noted that Dr.

Moore's assessment is based upon only one visit, and is thus entitled to only limited weight.  The

ALJ then pointed out inconsistencies between Dr. Moore's assessment and the record as a whole.

He first noted that, although plaintiff reported to Dr. Moore that he can only sit for about ten

minutes, plaintiff sat for a half-hour at the hearing.  The ALJ also noted that plaintiff's daily

activities indicate that he is capable of working.

The ALJ also found that Dr. Moore's opinion that plaintiff was incapable of sustaining a

40-hour work week was inconsistent with the medical record, particularly the records of

plaintiff's treating physician, Dr. Dausmann.  The record reveals that Dr. Dausmann treated

plaintiff's back and knee impairments rather conservatively.  He found only mild tenderness in

plaintiff's back and knees. (Tr. 140). Dr. Dausmann prescribed anti-inflammatories, which he noted provided relief. (Id.). Dr. Dausmann did not impose any functional restrictions on plaintiff, and advised plaintiff to start walking. (Tr. 29). The examining physician, Dr. Kim, found that plaintiff's lower back was not tender, he had no edema in his legs, his gait was stable, he was able to bear full weight on both legs, he was able to walk on his toes, and he was able to get on and off the examining table without significant problem. (Tr. 117). Dr. Kim noted that plaintiff complained of pain in his knees but, afer a few steps, he felt better. (Id.). In addition, as the ALJ pointed out, the State agency consultant expressed the opinion that plaintiff could perform sedentary work

Further, as the ALJ noted, Dr. Moore's residual functional capacity assessment is not inconsistent with the ALJ's determination, except that the ALJ rejected Dr. Moore's opinion that plaintiff required frequent breaks and Dr. Moore's conclusion that plaintiff could not sustain a 40-hour work week. The ALJ found that plaintiff could perform sedentary work, with a sit or stand option and had a mild impairment to attention or concentration, due to pain. (Tr. 14). Sedentary work is defined by 20 C.F.R. § 404.1567, which provides:

> (a) Sedentary work. Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

Dr. Moore expressed the opinion that plaintiff could not sit for more than 60 minutes sustained; could stand for less than 2 hours sustained; could walk for 20 minutes sustained; could lift or carry a maximum of 10 pounds sustained; and plaintiff requires a job that permits shifting positions at will in unpredictable intervals from sitting, standing, or walking. (Tr. 148-49). As

such, Dr. Moore's assessment is not inconsistent with the ALJ's determination that plaintiff can perform sedentary work with a sit or stand option.

Although plaintiff claims that the ALJ relied on the State agency medical consultant's opinion, the ALJ's residual functional capacity assessment is more restrictive than that of the medical consultant's. The medical consultant found that plaintiff could lift or carry twenty pounds occasionally; lift or carry 10 pounds frequently; stand or walk at least 2 hours in an 8-hour workday; sit for about 6 hours in an 8-hour workday; was unlimited in his ability to push or pull; could frequently balance, kneel, crouch, and crawl; could occasionally climb, balance, and stoop; and had no manipulative, visual, communicative, or environmental limitations. (Tr. 121-25). The ALJ, however, imposed the additional restrictions of a sit or stand option and a mild impairment to attention and concentration due to pain.

In light of the evidence in the record, including Dr. Moore's opinion as well as the records of Dr. Dausmann, and plaintiff's own testimony, there is substantial evidence in the record as a whole to support the ALJ's determination that plaintiff retains the residual functional capacity to perform sedentary work with a sit/stand option and a mild impairment to attention and concentration due to pain.

## **Conclusion**

It is the court's belief that substantial evidence in the record as a whole supports the decision of the ALJ finding plaintiff not disabled because the ALJ performed a sufficient credibility analysis, and because the ALJ properly assessed plaintiff's RFC. Accordingly, Judgment will be entered separately in favor of defendant in accordance with this memorandum.

Dated this ___29th__ day of March, 2006.

LEWIS M. BLANTON
UNITED STATES MAGISTRATE JUDGE